UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL DONALD HANSEN,<br><br>Defendant. | 4:21-CR-40080-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Paul Donald Hansen is before the court on an indictment charging him with possession of an unregistered shotgun with a barrel length of less than 18 inches.  See Docket No. 1.  Mr. Hansen has filed a motion to suppress certain evidence.  See Docket No. 28.  The United States ("government") resists the motion.  See Docket No. 33.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

**FACTS**

An evidentiary hearing was held on November 24, 2021.  Mr. Hansen was there in person along with his lawyer, Assistant Federal Public Defender Matt

Powers.  The government was represented by its Assistant United States Attorney, Connie Larson.  Two witnesses testified and two exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On October 3, 2020, at approximately 1 a.m., Officer Adrian Hoesli of the Tea, South Dakota, Police Department was on patrol.  He noticed a red four-door Chevrolet pick-up parked in a commercial construction area.  The area had one recreational vehicle ("RV") business that was completed and operating (though it was closed at that time of night) and other commercial buildings that were being built in the same area.

Some weeks prior to October 3, 2020, the owners of the RV business had caught people on surveillance video going through the parked RVs and stealing things such as refrigerators, televisions, tires, rims, and catalytic converters. The thieves had parked west of the RV business and then walked over to the business.  Here, the red pick-up was also parked west of the RV business.  In addition, Officer Hoesli testified construction equipment and tools had been stolen from this site.  Sergeant Brian Crosby, also of the Tea Police Department, testified that thefts of this nature are often connected to drug activity.

Officer Hoesli radioed that he was going to check out the parked vehicle. The officers testified that, whenever a Tea police officer makes a stop, another officer will automatically go to that officer's location as back-up for officer safety.  Sergeant Crosby was on duty that night, heard Officer Hoesli's

broadcast, and drove to his location. Both officers' vehicle cameras recorded their interaction with Mr. Hansen and his passenger. See Exhibits 1 & 2.[1]

Officer Hoesli approached the red pick-up but could not see inside it as the windows were fogged over. However, Officer Hoesli could see movement inside the vehicle. He made contact with Mr. Hansen, the defendant herein. There were two people, Mr. Hansen and a woman, huddled under a blanket in the back seat having "some kind of relations." Officer Hoesli noticed there was a large age difference between them, with the woman appearing to be 18-20 years old and the man appearing to be in his 40s. The age difference made both Officer Hoesli and Sergeant Crosby suspect there may be prostitution afoot. Sergeant Crosby testified that sometimes drugs, not money, are exchanged for sex in prostitution.

Officer Hoesli asked for identification. Mr. Hansen asked if there was a problem. Officer Hoesli said Mr. Hansen's parked vehicle was suspicious and asked if he had seen Mr. Hansen driving around earlier. Mr. Hansen said it was possible.

Officer Hoesli asked who the passenger was and Mr. Hansen replied, "Sleeping Beauty." Officer Hoesli asked if "Sleeping Beauty" had a name. Mr. Hansen said her name was "Nadia." Officer Hoesli then asked Nadia for

---

[1] Exhibit 1 contains three separate video views from Officer Hoesli's patrol vehicle: a frontal view of Mr. Hansen's pickup truck, a wide-angle frontal view of Mr. Hansen's truck, and a view of the rear seat in Officer Hoesli's patrol vehicle. Exhibit 2 contains one video view from Sergeant Crosby's patrol vehicle facing the rear of Mr. Hansen's truck. There are no side views of the truck from either exhibit.

some identification.  Mr. Hansen said Nadia needed a little privacy and asked Officer Hoesli to turn away.  Officer Hoesli responded "I'm not going to get shot in the back," and refused to turn away.  During this initial interaction, Mr. Hansen was argumentative with Officer Hoesli, asked if it was posted that he could not trespass there, asked if Officer Hoesli was trying to get a quota, and stated that he and his passenger were not doing anything wrong.

Nadia was unable to produce any identification.  Officer Hoesli asked for her last name.  He had to ask her to talk to him.  She then gave him her last name.  Officer Hoesli tried to get the spelling of Nadia's last name and had to ask Nadia repeatedly to talk to him.  He asked her for her birthdate.

Officer Hoesli then called in Mr. Hansen's identification information to check for arrest warrants.  He then called in Nadia's information.  Dispatch informed Officer Hoesli that there were no arrest warrants or restrictions for Mr. Hansen.  While waiting for dispatch to report back on Nadia, Officer Hoesli asked if there was anything in Mr. Hansen's truck that should not be there.  Mr. Hansen responded no.  Officer Hoesli then asked if Mr. Hansen minded if he looked inside the pick-up.  Mr. Hansen said he did mind.

Dispatch then told Officer Hoesli that the name he gave for Nadia did not come back with any records, though Nadia had told Officer Hoesli she had a valid South Dakota driver's license.  Officer Hoesli then asked Nadia to step out of the vehicle.  The woman climbed over the front seat and exited from the front passenger door even though there was a rear passenger door and she was in the back seat.

Officer Hoesli then escorted Nadia to his patrol vehicle and asked her to have a seat in his car. While walking, he asked her if she had anything on her she shouldn't have. She responded she did not. Officer Hoesli asked Nadia to get in the passenger side. She continued walking toward the driver's side door of the patrol vehicle. Officer Hoesli had to tell her again to get in on the passenger side.

Once in the patrol vehicle, Officer Hoesli asked Nadia to spell her last name for him again because he couldn't find anyone with that name. He asked her if she was sure she had a South Dakota driver's license. Nadia indicated she did have a valid South Dakota license and again spelled her last name. Officer Hoesli asked Nadia how she knew Mr. Hansen and she said they had been dating for about a year and a half. When asked how they met, Nadia responded they met through mutual friends.

Nadia's words were muffled and low and her head lolled during this conversation. In Officer Hoesli's words, she was "not all there." Sergeant Crosby's observations of Nadia were that she appeared "zoned out." Officer Hoesli, who was also trained as an Emergency Medical Technician and has worked as an ambulance EMT, testified that in his experience, when persons exhibit the kind of demeanor and behavior that Nadia was exhibiting, they are either (1) experiencing a medical event or (2) they are under the influence of narcotics. Sergeant Crosby suspected Nadia was under the influence of drugs.

While Officer Hoesli was speaking to Nadia in his patrol vehicle, Sergeant Crosby engaged in conversation with Mr. Hansen.  Mr. Hansen reiterated that he was not doing anything wrong.  Sergeant Crosby explained to Mr. Hansen that there had been recent thefts from the nearby RV business and that the thieves had parked where Mr. Hansen was now parked when they committed their thefts.  For this reason, Sergeant Crosby explained, police kept a close eye on this area.

Sergeant Crosby asked if Mr. Hansen had been arrested before. Mr. Hansen said he had, "a lifetime ago," for driving while under the influence. He denied any other arrests and asserted he was a "pretty good guy."

Officer Hoesli left the patrol vehicle to confer with Sergeant Crosby. Sergeant Crosby indicated to Officer Hoesli that he should inquire of Nadia about possible prostitution.  He wondered why these two were "out here in the middle of nowhere."

Officer Hoesli then returned to the patrol vehicle and began asking Nadia further questions about her relationship to Mr. Hansen, such as whether Mr. Hansen paid her for sex, and why, if they were dating, they were having sex in a construction site instead of at one of their homes or a hotel.  Nadia stated she had roommates and did not want to bring Mr. Hansen to her house. Officer Hoesli commented that there was a significant age difference between her and Mr. Hansen.

Officer Hoesli asked Nadia where she worked.  He also asked Nadia where Mr. Hansen worked.  He asked Nadia if there was anything in the truck

that should not be there.  She responded no.  He asked if the truck belonged to her, and she said it belonged to Mr. Hansen.

Officer Hoesli asked Nadia if she had any warrants out for her arrest. She said she had missed a court date on a speeding ticket and had just received a letter regarding that matter.  Officer Hoesli then obtained Nadia's address and phone number.  At approximately 21 minutes into the encounter on Exhibit 1, dispatch confirmed there was a valid and outstanding warrant for Nadia from Brookings County.

While Officer Hoesli spoke to Nadia, Sergeant Crosby resumed talking to Mr. Hansen.  He asked him if he was "decent," if he had pants on.  He asked if Mr. Hansen had had anything to drink.  He then asked if there were any guns in the truck.  Mr. Hansen responded in the affirmative, indicating there were two guns.  Sergeant Crosby then asked Mr. Hansen to exit the truck. Mr. Hansen asked why.  Sergeant Crosby explained that he was asking him to come out of the truck because of the firearms.  Mr. Hansen questioned why he was being detained and argued.  Mr. Hansen stated he needed to get his boots. He said he was just going to grab his keys, roll the windows up, and get out, which he then did.  On Exhibit 2, Mr. Hansen can be seen putting both hands in his coat pockets immediately upon exiting the truck.  Exhibit 2 at 11:12.[2]

---

[2] The exhibit does not show the time of day, but rather the time elapsed on the video, which is the time cited by the court.  Because Sergeant Crosby's video started later than Officer Hoesli's video, the time is not the same on both videos—i.e., 12 minutes into the encounter on Sergeant Crosby's video is not 12 minutes into the encounter on Officer Hoesli's video.

He went to the rear of his truck and opened the tailgate and got some shoes out of the back end.  He then sat down on the bumper of the truck to put his shoes on.  Mr. Hansen told Sergeant Crosby to "calm down," though Sergeant Crosby did not act or sound agitated in any way.  Mr. Hansen stated, "it's not you against me, it's us against them."  Sergeant Crosby testified he thought Mr. Hansen was trying to charm him.

Sergeant Crosby asked Mr. Hansen to accompany him to his patrol vehicle.  He asked Mr. Hansen to remove his hands from his coat pockets.  Sergeant Crosby asked if it was okay to pat Mr. Hansen down to make sure he did not have any weapons.  Mr. Hansen asked why.  Sergeant Crosby stated it was because he had guns in the truck.  Mr. Hansen queried whether he had a Second Amendment right to have a firearm.  Sergeant Crosby then explained that under Terry v. Ohio[3] police had a right to pat him down to make sure he did not have a weapon.  Sergeant Crosby explained that Nadia had a warrant out for her arrest.  Mr. Hansen said he did not want to sit in the car.  Sergeant Crosby stated that he needed Mr. Hansen to sit in the car for the time being.

Mr. Hansen asked whether they were going to arrest Nadia and what she was being arrested for.  Sergeant Crosby told Mr. Hansen they would allow him to talk to Nadia before they took her away and she could reveal the nature of her arrest if she wished to.  Mr. Hansen wanted to know where they were going to take Nadia.  Sergeant Crosby indicated she would be taken to the Minnehaha County Jail.

---

[3] 392 U.S. 1 (1968).

Sergeant Crosby told Mr. Hansen that he was going to leave him in the patrol car and go to Officer Hoesli's location to talk to Nadia. Mr. Hansen tried to dissuade Sergeant Crosby from talking to Nadia, saying she was "a skinny little girl" and "you don't need to be over there too. You can just hang out here with me." "What?" Sergeant Crosby asked. Mr. Hansen replied he didn't want to be locked in the patrol vehicle alone. Sergeant Crosby assured Mr. Hansen he would not be locked in, but that Sergeant Crosby needed him to remain in the patrol car. Sergeant Crosby testified he believed Mr. Hansen was trying to control his actions.

Officer Hoesli and Sergeant Crosby again conferred. Sergeant Crosby told Officer Hoesli there was a gun in the truck, Mr. Hansen was very nervous, and that Mr. Hansen would not allow Sergeant Crosby to search the truck. Also, Sergeant Crosby told Officer Hoesli that there was air freshener in the truck.

Sergeant Crosby told Officer Hoesli he should ask Nadia if she had ever been arrested. Sergeant Crosby asked Officer Hoesli if Nadia had a purse in the truck. Officer Hoesli noted the fog was clearing off the truck windows and asked if Sergeant Crosby was able to see anything in plain view. Sergeant Crosby noted that Mr. Hansen made sure to roll the window up before he got out of the truck. Officer Hoesli noted that, when Nadia got out of the truck, she was quick to shut the door behind her.

Back in the patrol vehicle, Officer Hoesli asked Nadia if she had ever been arrested before or if she had used drugs. She said no to both.

Officer Hoesli asked if she had consumed any narcotics or alcohol that night. She said no. Officer Hoesli then told Nadia that Brookings County did ask that she be brought in on that warrant. He asked her what of hers was in the truck. Nadia responded her purse, and clothes—bra and panties—were in the truck. Officer Hoesli asked why there was a gun in the truck. Nadia responded she did not know.

Officer Hoesli asked Nadia why she was all hunched over, and Nadia responded it was because she was embarrassed about the situation. Officer Hoesli asked for the location of Nadia's purse in the truck (e.g., back seat, front seat) because they would need to bring her purse with them to the Brookings jail. Nadia replied she would like to just leave her purse in the truck. When Officer Hoesli asked why she wanted to leave her purse in the truck, she said it was because she was upset. Officer Hoesli asked what being upset had to do with whether she took her purse with her or not. Nadia responded it was because she just wanted to leave her purse in the truck.

Officer Hoesli left the patrol vehicle again and conferred with Sergeant Crosby. He told Sergeant Crosby he believed Nadia had something to hide in her purse as she indicated she wanted to leave the purse and not have it retrieved from the truck. Officer Hoesli asked dispatch if they had received written confirmation that Brookings County wanted Nadia arrested. Dispatch indicated they had received verbal confirmation but were still waiting for the teletype confirmation. This exchange occurred 29 minutes into the encounter on Exhibit 1. Dispatch notified Officer Hoesli that it had received teletype

confirmation that Brookings County wanted Nadia held at 50:50 minutes on Exhibit 2.

Officer Hoesli asked Nadia to step out of the patrol vehicle.  He handcuffed her and placed her in the rear of the vehicle (Mr. Hansen can be heard protesting and scoffing inside Sergeant Crosby's vehicle as he watches). Video footage from the rear of the patrol vehicle shows Nadia slumping to the side and moving her head slowly.  Exhibit 1, view 3.

Sergeant Crosby returned to Mr. Hansen's location and told him (falsely) that Nadia had indicated there was contraband in the truck.  Mr. Hansen denied this.  Sergeant Crosby suggested maybe the contraband was in Nadia's purse.  Mr. Hansen replied, "I doubt it."

Mr. Hansen asked for his identification back.  Sergeant Crosby indicated Officer Hoesli had his card.  Before taking her away, the officers allowed Nadia and Mr. Hansen to talk.  Mr. Hansen told Nadia he would bond her out and get her home safely.  While Mr. Hansen and Nadia spoke, Sergeant Crosby looked through the windows of Mr. Hansen's truck with his flashlight.  Exhibit 1 at 32:44.

Mr. Hansen asked Officer Hoesli for his driver's license back.  At this point Sergeant Crosby told Mr. Hansen he had observed a hypodermic needle in the driver's seat near the center console in the truck and placed Mr. Hansen in handcuffs.  By way of explaining the needle, Mr. Hansen said he was a diabetic.  Officer Hoesli asked what type, and Mr. Hansen said Type 1. Sergeant Crosby then asked who his doctor was and where his insulin was

11

stored.  Mr. Hansen said he did not have any insulin in the truck.

Officer Hoesli testified that in his experience as an EMT, few diabetics inject

insulin with hypodermic needles these days as there are other ways diabetes

is treated.

Sergeant Crosby then explained that the officers were going to detain

Mr. Hansen and search Mr. Hansen's truck.  Mr. Hansen asked if he was under

arrest.  Sergeant Crosby said, "Negative.  You are being detained."  At no point

did either officer read Mr. Hansen his <u>Miranda</u>[4] advisements.

Mr. Hansen engaged in some argumentative conversation with

Sergeant Crosby.  Sergeant Crosby told Mr. Hansen he would field test the

syringe and, if it came back with insulin, they would allow Mr. Hansen to go.

Sergeant Crosby asked Mr. Hansen what kind of drugs Nadia was on as it was

obvious she was on something.  He noted she could barely talk.  Mr. Hansen

denied any knowledge of Nadia ingesting any illegal substances.  Mr. Hansen

reiterated that he was not giving permission to search his truck.

Sergeant Crosby confirmed the officers were going to search anyway.

Mr. Hansen questioned under what law they were able to search.  The officers

said, "Plain view."

Sergeant Crosby asked Mr. Hansen how long he had been using.

Mr. Hansen responded by asking Sergeant Crosby if *he* was on drugs because

his pupils were huge.  Mr. Hansen denied that he was on drugs.  The officers

discovered the truck was locked at 37 minutes into the encounter.  <u>See</u> Exhibit

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

1 at 37:41.  They asked Mr. Hansen where the keys were.  Mr. Hansen continued to reiterate he did not give consent to search.  Mr. Hansen questioned why the officers approached his truck in the first place.  The officers responded it was suspicious to find his truck in the location where it was.  Mr. Hansen asked again why they were searching.

The officers asked for the keys.  Mr. Hansen reiterated that he did not give permission to search.  Mr. Hansen asked if he was being arrested.  The officers said he was not under arrest but was being detained while they searched his truck.  Mr. Hansen indicated he wanted to talk to a lawyer.  Exhibit 2 at 36:19.  Sergeant Crosby offered to get Mr. Hansen's phone for him from the truck (to call his lawyer), but that he needed to have the keys to do so.  The officers asked where the keys were.  Mr. Hansen claimed not to know where the keys were and suggested he may have locked them in the truck.  Mr. Hansen stated he had a concrete pour at 7:30 the next morning and he "didn't have time for this."  The keys to the truck were later found in Mr. Hansen's rear jeans pocket, where they presumably had been all along.

At one point during this interlude, one of the officers returned to speak to Nadia, who was still in the back of Officer Hoesli's patrol vehicle.  They told Nadia they had observed the syringe in the truck and asked her how long Mr. Hansen had been using drugs.  She replied he had been using for one year.

The officers asked Mr. Hansen if they should break the truck window.  Mr. Hansen said no.  The officers asked Mr. Hansen what kind of insulin he was on, and Mr. Hansen claimed that was protected information he did not

13

have to tell the officers about.  Further argument ensued with Mr. Hansen repeatedly insisting he did not know where the keys were, he did not give the officers permission to search, and he wanted to know why he was being detained.  The officers continued to tell Mr. Hansen they were going to search anyway because they could observe a hypodermic needle in the truck, and they could see a small vial in the truck on the center console.

One of the officers inquired about the ability to get a K-9 unit to come to their location.  Exhibit 2 at 38:49.  Dispatch responded that the State Highway Patrol could make a K-9 available.  The officer asked what the estimated time of arrival ("ETA") would be.  Dispatch responded the ETA was indeterminate. Officers continued to ask Mr. Hansen for the truck keys.  Mr. Hansen continued to deny that he was consenting to the search, to deny knowledge of where the truck keys were, and to assert the needle was for medical use.

Finally, the officers called a tow truck to open Mr. Hansen's door. Exhibit 2 at 1:03:00.  The tow truck arrived at 1:24 on Exhibit 2.  The tow truck driver succeeded in opening the door at 1:28 on Exhibit 2.  When the officers searched Mr. Hansen's truck, they found more than one scale, a needle cap in the back seat, the syringe from the front seat which tested positive for methamphetamine, a needle kit with five pre-loaded syringes under the driver's seat, several used needles and a pipe in the center console, a handgun in the front seat, and a loaded 20-guage sawed-off shotgun in the backseat.  It is the shotgun which forms the basis of Mr. Hansen's federal indictment.  At no time

during the contact between the officers and Mr. Hansen did the officers advise him of his <u>Miranda</u> rights.

Mr. Hansen now moves to suppress the evidence seized from his vehicle and statements police obtained from him, alleging his Fourth and Fifth Amendment rights were violated.  Docket No. 28.  The government resists the motion.  Docket No. 33.

## DISCUSSION

**A.    Fourth Amendment Arguments**

**1.    Reasonable Suspicion to Approach the Vehicle**

Mr. Hansen argues that law enforcement had no legitimate reason to approach his vehicle and that doing so violated his Fourth Amendment rights. <u>See</u> Docket No. 29.  The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  <u>United States v. Fuse</u>, 391 F.3d 924, 927 (8th Cir. 2004) (quoting <u>United States v. Martinez</u>, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979))).

If there is reasonable suspicion to stop or approach the vehicle, however, the stop complies with the Fourth Amendment.  <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014); <u>United States v. Spotts</u>, 275 F.3d 714, 718 (8th Cir. 2002); <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999).  An officer

making a Terry[5] stop based upon "reasonable suspicion," "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989).  Instead, police must have "a 'particularized and objective basis for suspecting the particular person of criminal activity.' "  Navarette, 572 U.S. at 396 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

"Reasonable suspicion" in support of a Terry stop "is dependent upon both the content of information possessed by police and its degree of reliability."  Id. at 397 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).  In evaluating the standard, courts must take into account "the whole picture," the "totality of the circumstances."  Id. (quoting Cortez, 449 U.S. at 417).  A mere "hunch" does not suffice, but the standard requires "considerably less proof of wrongdoing" than "preponderance of the evidence" or probable cause.  Id. (quoting Sokolow, 490 U.S. at 7).  A traffic stop need not be based on the police officer's personal observation—it can be based on information supplied by a third party.  Id.  Even a single anonymous tip may provide the necessary reasonable suspicion if the indicia of reliability are sufficient—such as richness of detail, eyewitness observation, use of the 911 system to report the tip, and an absence of any reason to suspect the tipster had a motive to fabricate.  Id.

"[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the

---

[5] Terry v. Ohio, 392 U.S. 1 (1968).

stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007)
(citing Whren v. United States, 517 U.S. 806, 813 (1996). See also United
States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (*per curiam*) ("[T]he fourth
amendment is not violated if an objectively good reason for a traffic stop exists,
whatever the actual subjective motive of the officer making the stop may have
been."). Although a traffic violation can provide the basis for a Terry stop,
there is no requirement that a traffic violation occur if there are other grounds
providing the officer with a reasonable, articulable suspicion of criminal
activity. United States v. Jacobsen, 391 F.3d 904, 907 (8th Cir. 2004) (quoting
United States v. Briley, 319 F.3d 306, 364 (8th Cir. 2003) (quotation omitted)).

In United States v. Evans, 830 F.3d 761, 764-65 (8th Cir. 2016), police
approached two vehicles, one belonging to Evans and the other to Banks,
which were parked at an abandoned and closed carwash late at night in a
high-crime area. An officer wanted to make sure no one was hiding within
Evans' car, so he approached the car and shined his flashlight through the
windows, observing marijuana and a handgun on the front passenger seat. Id.
at 764. Evans was later charged with being a felon in possession of a firearm.
Id.

The court held the police officer had "reasonable suspicion that criminal
activity was afoot when he pulled in behind Banks's car—parked in an
abandoned carwash parking lot late at night with its lights on—to investigate
what the car's occupants might be doing in this high-crime area." Id. at 766.
Upon investigating, the officer saw Evans, a known felon, standing by his car in

the dark carwash bay.  Id.  The officer approached Evans' car to make sure no one was hiding inside it.  Id.  The court held police had a lawful reason for being in close proximity to Evans' car and the discovery of the firearm on the front seat was supported by the plain view exception to the warrant requirement.  Id.

Here, the presence of Mr. Hansen's truck in a construction site, which had been the location of numerous thefts in the recent past, at 1 a.m. gave rise to reasonable suspicion allowing Officer Hoesli and Sergeant Crosby to approach his vehicle and check to see if illegal activity was going on.

But Mr. Hansen argues it was obvious what he and the woman were doing—they were having sex and, both being consenting adults, there was nothing illegal or suspicious going on.  However, legal activity can form the basis of reasonable suspicion.

In United States v. Perkins, 363 F.3d 317, 326-27 (4th Cir. 2004), there was an informer's tip as to open gun possession, an activity that was *legal* in West Virginia.  The defendant argued that his Fourth Amendment rights were violated because the tip did not report illegal activity, only legal activity.  The court rejected this argument.  The court drew a distinction between the reasonable suspicion standard required in Terry and the probable cause standard applicable in other contexts.  Under the probable cause standard, the question is whether the officer had a reasonable basis for believing that a suspect "had committed or was committing an offense."  In other words, criminal activity must have already occurred or be occurring.  The reasonable

suspicion standard asks whether the officer reasonably believes that "criminal activity may be afoot." The difference, the court explained, was between past or present illegalities (probable cause) and an officer's ability to prevent future wrongdoing (reasonable suspicion), which is at the heart of Terry. Id.

The Perkins court noted that in Terry itself, the actions of the defendants which the officers observed were legal—they were pacing back and forth and talking to each other outside of a store. Perkins, 363 F.2d at 327 (citing Terry, 392 U.S. at 22-23). However, the court stated that "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." Id. at 321 (citing United States v. Arvizu, 534 U.S. 266, 274-75 (2002); and Sokolow, 490 U.S. at 9-10). In Perkins, the tip from the known informer was that two men were pointing rifles in various directions in the front yard of a duplex well known for drug activity in a high crime and drug trafficking area. Perkins, 363 F.3d at 327. It is not illegal to openly carry a firearm under West Virginia law, and sportsmen routinely display hunting and sporting rifles. Id. However, the context of the tip was important: here, the activity was taking place outside of a known drug house in the middle of a residential, high-crime, drug-ridden neighborhood. Id. This type of activity in this setting, "would give any officer a commonsensical reason to be suspicious." Id. The court concluded that reasonable suspicion existed because the reported behavior, while legal, rightfully aroused the officer's suspicion warranting an investigatory stop.

Although the Perkins decision is not controlling authority in this jurisdiction, it is in accord with Supreme Court precedent, which is controlling. See Illinois v. Wardlow, 528 U.S. 119 (2000). In Wardlow, police officers were patrolling an area where heavy drug trafficking occurred. Wardlow, 528 U.S. at 121. Upon seeing the officers, Wardlaw fled. Id. The officers caught up with him, stopped him, and patted him down, discovering a .38-caliber handgun. Id. The Court held that the search of Wardlow under these circumstances did not violate the Fourth Amendment. Id.

The Court stated that a person's presence in "an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that a person is committing a crime." Id. at 124 (citing Brown v. Texas, 443 U.S. 47 (1979)). But the fact that the stop occurred in a high-crime area was relevant to the reasonable suspicion inquiry, and the officers' suspicion was also supported by Wardlow's unprovoked flight. Id. at 124-25. The Wardlow decision did not involve a tip, as Perkins did, but the activity of Wardlow in that case, like the activity of Perkins and Terry, was legal activity. Given the context, however, each court found the legal activity of each defendant to nonetheless gave rise to reasonable suspicion supporting the officers' stops. See also 4 Wayne R. LaFave, Search & Seizure §9.5(h), 571 (2004) (stating that the central issue of cases involving tips in the context of Terry stops "is whether the informant's information is so reliable and complete that it makes past, present *or pending* criminal conduct sufficiently likely to

justify a stopping of the designated person for investigation.")
(emphasis supplied).

In United States v. Watts, 7 F.3d 122 (8th Cir. 1993), a citizen called law
enforcement and reported several suspicious men loading what appeared to be
long guns into a blue van. Id. at 123-24. Police pulled Watts' blue van over,
checked Watts' driver's license, and told Watts and his passenger that they had
been pulled over because of a report of property being loaded into a van. Id.
Watts and his passenger gave conflicting answers when asked if there were any
guns in the van. Id. Law enforcement then searched the van, found three
guns, and wrote down the serial numbers on the guns. Id. The alleged owner
of the guns denied knowing Watts or his passenger, and Watts was then
arrested for being a felon in possession of a firearm. Id. at 124.

Watts argued that the stop of his van violated the Fourth Amendment.
Id. The Eighth Circuit noted that a Terry stop can be supported by suspicious
activity that does not conclusively prove guilt. Id. at 125 (citing United States
v. Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988)). Conduct that is consistent
with both guilt and innocence may nevertheless support a reasonable
suspicion justifying a Terry stop. Id. The court concludes that Officer Hoesli's
decision to investigate Mr. Hansen and the other occupant of his truck was
supported by reasonable suspicion when taking all the facts and
circumstances into account.

## 2.    Duration of the Seizure

Mr. Hansen also argues his Fourth Amendment rights were violated by the duration of the seizure because law enforcement did not have reasonable suspicion or probable cause to support his continued seizure.  A traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]"  United States v. Jacobsen, 466 U.S. 109, 124 (1984).  Mr. Hansen asserts that, even if the initial traffic stop was justified, the officers unjustifiably prolonged the stop beyond the limitations of the Fourth Amendment.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407 (2005)], and attend to related safety concerns[.]"  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  Royer, 460 U.S. at 500.  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."

22

Caballes, 543 U.S. at 407.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354.

"After a law enforcement officer initiates a traffic stop, the officer may detain the offending motorist while the officer completes a number of routine, but somewhat time-consuming tasks related to the traffic violation."  United States v. Englehart, 811 F.3d 1034, 1040 (8th Cir. 2016) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission [during a traffic stop typically] includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  Rodriguez, 575 U.S. at 355 (quotation and citation omitted).  See also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)).  "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.' "  United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

To extend a routine traffic stop, an officer needs reasonable suspicion of additional criminal activity.  Rodriguez, 575 U.S. at 355.  Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop.

23

Terry, 392 U.S. at 21.  This standard is "less demanding" than probable cause and much lower than preponderance of the evidence.  Wardlow, 528 U.S. at 123.

To determine whether the requisite degree of suspicion exists, courts must decide whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion, meaning the totality of the circumstances must be considered.  Jones, 269 F.3d at 927.  The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.' " Id. (quoting Reid v. Georgia, 448 U.S. 428, 441 (1980)).

Here, there were complications in completing routine tasks as well as additional indicia of criminal activity afoot that support prolonging the stop. First, Officer Hoesli could not verify Nadia's identity.  An officer has a right to verify the identity of a vehicle's occupants and to check for outstanding warrants.  Rodriguez, 575 U.S. at 355; Sanchez, 417 F.3d at 975.  Once Officer Hoesli verified Nadia's identity, he learned she had an outstanding arrest warrant.  He made inquiry whether Brookings County wanted Nadia taken into custody and had to wait to receive that confirmation.  Verbal confirmation was given at approximately 28 minutes into the stop on Exhibit 1. Written confirmation that Brookings County wanted Nadia taken into custody

was not received until 55:05 on Exhibit 1.  Therefore, the duration of the traffic stop was justified on this basis at least until that time.

But verifying Nadia's identity and determining whether to take Nadia into custody on her warrant was not the only factor justifying the duration of the traffic stop.  There were numerous indicia of further suspicious activity.  Both officers believed Nadia was under the influence of a narcotic as she acted "not all there" and "zoned out," and instructions had to be repeated to her multiple times.

Mr. Hansen himself contributed to the suspicion of the officers by first stating that his companion's name was "Sleeping Beauty" instead of giving her real name.  Both occupants of the truck seemed especially interested in keeping the officers from seeing inside the truck by rolling up windows, climbing over the back seat to exit the front door, and quickly shutting the doors behind them.  Also, Nadia did not want Officer Hoesli to retrieve her belongings from the truck and take them to the jail with her.  And then there was the large age difference between Mr. Hansen and Nadia, which gave rise to the officers' suspicion that prostitution was afoot.

Finally, when Sergeant Crosby spotted the hypodermic needle in the front seat of the truck in plain view (Exhibit 1 at 32:44), the officers had reasonable suspicion to continue to investigate.  From that point onward, the delay in resolving the officers' suspicions was solely due to Mr. Hansen because he refused to give them the keys to the truck or to even acknowledge that he had them, forcing them to explore other options for accessing the truck.  The

25

court concludes that the duration of the traffic stop did not violate

Mr. Hansen's Fourth Amendment rights.  There was a continuing stream of

complications in carrying out the routine tasks associated with the stop, as

well as new indicia of criminal activity afoot, that lawfully allowed the officers

to continue to detain Mr. Hansen until those suspicions and complications

were resolved.

Mr. Hansen argues that the officers' subjectively intended to get inside

his truck and search nearly from the inception of the traffic stop.  But

subjective motives of the officers are irrelevant.  Herrera-Gonzales, 474 F.3d at

1109; Andrews, 465 F.3d at 347.  What is relevant is whether, given the totality

of circumstances, there was an objectively verifiable reasonable suspicion to

extend the duration of the stop.  Navarette, 572 U.S. at 396.   The court finds

there was.

### 3.    Search of Mr. Hansen's Vehicle

Mr. Hansen also argues the warrantless search of his vehicle violated his

Fourth Amendment rights.  Where a warrantless search occurs, the burden is

on the government to show by a preponderance of the evidence that an

exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403

U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th

Cir. 2005).  The government argues the plain view exception to the warrant

requirement applies in this instance.

Because *any* evidence seized by the police will likely be in plain view, the

plain-view doctrine may only be used to justify a warrantless seizure when the

26

initial intrusion that brings the police within plain view of the items seized is supported by one of the recognized exceptions to the warrant requirement. Horton v. California, 496 U.S. 128, 135 (1990).  The plain-view doctrine does not stand alone; rather it works in conjunction with a prior justification for the lawful presence of the police at the place of the warrantless seizure.  Id. (quoting Coolidge, 403 U.S. at 465-66).  That is, a police officer who comes across evidence while in hot pursuit of a fleeing suspect, while validly arresting a defendant, or while executing a valid search warrant for other objects may rely on the plain view doctrine to seize items in plain view that are not covered by a warrant.  Id. at 135-36 (quoting Coolidge, 403 U.S. at 465-66).  Finally, if a police officer has some legitimate reason for being present that is *unconnected* with a search directed against the defendant, that is, an officer is not searching for evidence against the accused, then any incriminating objects in plain view may be seized without a warrant.  Id. at 135.

In short, the plain view exception to the warrant requirement applies whenever officers "are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object."  Evans, 830 F.3d at 766 (quotation omitted).

In United States v. Bynum, 508 F.3d 1134, 1136 (8th Cir. 2007), officers followed Bynum's vehicle after observing him commit several traffic infractions. Bynum stopped his vehicle and got out, leaving the driver's side door open.  Id. Officers approached and escorted Bynum to the patrol car, believing he was

about to flee.  Id.  After seeing Bynum's identification, officers recognized him as someone who was a suspect in two gun-pointing incidents and also discovered his driver's license was suspended.  Id.  The owner of the house in whose driveway Bynum parked disclaimed knowing Bynum.  Id.  Because Bynum's license was suspended, the officers determined to tow his vehicle and approached it.  Id.  The officers saw through the open driver's door a semi-automatic handgun and marijuana.  Id.  Bynum was arrested for being a felon in possession of a firearm.  Id.  Bynum moved to suppress the firearm, claiming the warrantless search of his vehicle was in violation of the Fourth Amendment.  Id.

The court rejected this argument, stating "[t]he act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.' . . .  Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has right to be in close proximity to the vehicle."  Id. at 1137 (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing Texas v. Brown, 460 U.S. 730, 740 (1983)), and citing United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999)).  The court held the officers had a right to be in close proximity to Bynum's vehicle because he had no valid driver's license and department policy required the officers to impound the vehicle.  Id.  Thus, the

court upheld the seizure of the firearm under the plain view doctrine.  Id.  See also Evans, 830 F.3d at 766-67.

The court finds Bynum to be dispositive.  Here, as already discussed above, Sergeant Crosby was in a lawful position near Mr. Hansen's truck because the traffic stop, and continued duration of the stop, was justified by reasonable suspicion.  From that lawful vantage point, Sergeant Crosby observed a hypodermic needle in the truck and a small container.  Although Mr. Hansen offered up the explanation that he was a diabetic and the needle was used to inject insulin, the officers were not required to accept his explanation.  In fact, the explanation further increased the officers' suspicions because, as Officer Hoesli testified, few diabetics treat their condition these days by using hypodermic needles to inject insulin.  There was nothing illegal about looking through the windows of Mr. Hansen's truck and the incriminating nature of the item seen—especially given Nadia's lethargic, confused demeanor and comportment—was immediately apparent.  The court concludes the warrantless search of Mr. Hansen's truck was lawful under the plain view exception to the warrant requirement.

**B.    Questioning of Mr. Hansen Without Miranda[6] Warnings**

Finally, Mr. Hansen argues his Fifth Amendment rights were violated when law enforcement questioned him after he had been handcuffed without having been given Miranda advisements.  "[A]n individual must be advised of the right to be free from compulsory self-incrimination, and the right to the

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, a Miranda warning is required prior to law enforcement questioning an individual whenever the individual is in custody and is being interrogated. United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. See United States v. Charbonneau, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. See United States v. Moore, 104 F.3d 377, 392 (D.C. Cir. 1997) (Silberman, J., concurring) ("[I]t is the appellant's burden to establish factually that he was in custody as a pre-condition to an argument that the Constitution protects his silence[.]").

The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, at *12 (W.D. Mo. Dec. 6, 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Hansen's statements were not the subject of custodial interrogation on the government. See United States v.

McCarty, No. CR. 08-50035, 2008 WL 11404530, at *5 (D.S.D. Aug. 25, 2008) (placing burden on government to show defendant's statements were not the subject of custodial interrogation), report and recommendation adopted as modified, 2008 WL 11404531 (D.S.D. Oct. 7, 2008), aff'd, 612 F.3d 1020 (8th Cir. 2010).

A suspect is considered to be "in custody" either upon his or her formal arrest or "under *any other circumstances* where the suspect is deprived of his" or her "freedom of action in *any* significant way." Griffin, 922 F.2d at 1347 (citing Berkemer, 468 U.S. at 429). The Eighth Circuit sets forth a list of non-exclusive indicia of custody that courts apply to determine whether a reasonable person would believe they were in custody:

> (1) [W]hether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and], (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Laurita, 821 F.3d 1020, 1024 (8th Cir. 2016) (quoting Griffin, 922 F.2d at 1349). Furthermore, when employing the Miranda custody analysis, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, 378 F.3d 822, 828 (8th Cir. 2004).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. See Rhode Island v.

31

Innis, 446 U.S. 291, 301 (1980); see also United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect."). The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant. United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301).

Once the hypodermic needle was seen by Sergeant Crosby inside the truck, Mr. Hansen was handcuffed. Exhibit 1 at 33:30. The officers repeatedly told him he was being detained only, not arrested, but it is clear they did not believe Mr. Hansen's explanation about the presence of the needle (one of the officers told Mr. Hansen they were sure it was methamphetamine), and it was equally clear the officers were not going to release Mr. Hansen, if at all, until they searched his truck. Although Mr. Hansen himself initiated much of the conversation with the officers from this point on, he did repeatedly ask for a lawyer. The officers would not allow him to call a lawyer unless Mr. Hansen handed over the keys to his truck. Thus, the officers offered a quid pro quo: they implicitly demanded that Mr. Hansen make it easier to search his truck and, in return, they would let him use his cell phone to call a lawyer. Neither officer acknowledged that Mr. Hansen might use their phones to call a lawyer. In any case, Mr. Hansen made no inculpatory statements during this interval.

Although merely handcuffing a person while he is being detained does not automatically render that person "in custody" for purposes of <u>Miranda</u> (<u>United States v. Martinez</u>, 462 F.3d 903, 908-09 (8th Cir. 2006)), there were other indicia of custody here.  Mr. Hansen presumably knew the officers were going to find illegal drugs when they searched his truck, and the officers made it clear they *were* going to search his truck.  Therefore, Mr. Hansen and any reasonable person in his situation would know that, if he was not yet under arrest, he soon would be.  A reasonable person in these circumstances would not feel free to leave.

In addition, the officers used stratagems to try to overcome Mr. Hansen's free will, such as falsely telling him Nadia had said there was contraband in the truck, suggesting the officers would break a window to the truck to gain entry if Mr. Hansen did not capitulate to their will and hand over the keys, and suggesting no call to a lawyer would be allowed unless Mr. Hansen turned over the keys.  <u>Flores-Sandoval</u>, 474 F.3d at 1146-47 (whether officers used strong-arm tactics or stratagems is one factor the court should consider in deciding if the suspect was in custody).  The court concludes based on all the circumstances that all statements made by Mr. Hansen after he was handcuffed should be suppressed.  He was in custody at this point and the officers continued to press him with questions, telling him to be honest with them and admit there were drugs in the truck.

All statements made by Mr. Hansen before he was handcuffed are not in violation of the rule announced in <u>Miranda</u> and should not be suppressed.  Up

until the needle was discovered, a reasonable person in Mr. Hansen's place would not have felt they were under the equivalent of arrest.  Sergeant Crosby repeatedly told Mr. Hansen he was not under arrest, he was not handcuffed and, although he was asked to sit in Sergeant Crosby's patrol vehicle, the door was unlocked and he was seated in the front passenger seat.  Sergeant Crosby explained the presence of the guns in Mr. Hansen's truck were the reason Sergeant Crosby had to ensure that Mr. Hansen was kept separate from the truck.  Up until this point, the officers had also not lied to Mr. Hansen or attempted to overcome his will with any strong-arm tactics.  He was treated respectfully and politely.  Therefore, no Miranda violation occurred prior to 33:15 on Exhibit 1.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying Mr. Hansen's motion to suppress [Docket No. 28] as to the physical evidence seized from his vehicle and any statements made prior to the time he was placed in handcuffs.  The court recommends granting the motion to suppress as to all statements made by Mr. Hansen after he was placed in handcuffs.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

34

Objections must be timely and specific in order to require *de novo* review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED December 3, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge

35